UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

LEANNA RAYE OWENS,                )
                                  )
              Plaintiff,          )
                                  )        No. 1:12-cv-209
v.                                )
                                  )        *Collier / Lee*
COMMISSIONER OF SOCIAL SECURITY,  )
                                  )
              Defendant.          )

## REPORT AND RECOMMENDATION

Plaintiff Leanna Raye Owens brought this action pursuant to 42 U.S.C. § 405(g) seeking judicial review of the final decision of the Commissioner of Social Security ("Commissioner" or "Defendant") denying her disability insurance benefits ("DIB") and supplemental security income ("SSI"). Plaintiff and Defendant have both moved for summary judgment [Docs. 9, 11]. Plaintiff alleges the Administrative Law Judge ("ALJ") failed to comply with the "treating physician rule" and erred in giving less than controlling weight to the opinion of her treating psychologist. For the reasons stated below, I **RECOMMEND** that (1) Plaintiff's motion for summary judgment [Doc. 9] be **DENIED**; (2) the Commissioner's motion for summary judgment [Doc. 11] be **GRANTED**; and (3) the decision of the Commissioner be **AFFIRMED**.

## I.     ADMINISTRATIVE PROCEEDINGS

Plaintiff initially filed her application for DIB and SSI on July 16, 2010, alleging disability as of April 27, 2005 (Transcript ("Tr.") 122-29). Plaintiff's claims were denied initially and upon reconsideration and she requested a hearing before the ALJ (Tr. 62-70, 74-82, 85-90). The ALJ held a hearing on December 20, 2011, during which Plaintiff was represented by an attorney (Tr. 39-61).

1

The ALJ issued his decision on January 26, 2012 and determined Plaintiff was not disabled because there were jobs that existed in significant numbers in the economy that she could perform (Tr. 16-33). The Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final, appealable decision of the Commissioner (Tr. 1-8, 14). Plaintiff filed the instant action on June 27, 2012 [Doc. 1].

## II.     FACTUAL BACKGROUND

### A.     Education and Background

Plaintiff was 35 at the time of the hearing before the ALJ, had completed the eleventh grade, and later received her GED (Tr. 43, 157). Plaintiff had most recently worked as tax preparer from January to April 2009 and from January to April 2010, but testified she was working for a friend who gave her extra breaks and she primarily performed clerical tasks (Tr. 42-43, 149, 157, 172). Plaintiff testified she was not going to work as a tax preparer again this year because she was having a lot of problems being around other people (Tr. 43). Her last employment prior to preparing taxes was at a day care, and she was fired for having a fight with a coworker (Tr. 46). Plaintiff stated she had had problems being around people for many years, but was having more difficulties controlling it in recent years (Tr. 43). Plaintiff testified that her other symptoms had worsened too, and she was hearing voices all the time and having lapses where she lost days and did things she did not remember doing (Tr. 47-48). Plaintiff testified that others would later tell her that her demeanor was totally different during those occasions and they happened every few months from 12 hours to three days (Tr. 48-49). Plaintiff had problems sleeping due to vivid nightmares about abuse (Tr. 49-50). Plaintiff testified to still having thoughts about suicide and was very nervous during the hearing because she did not go out into public much (Tr. 51). Plaintiff had panic attacks twice a week when

2

she was nervous or had to go out in public and had mood swings where she would suddenly get very angry (Tr. 52). Plaintiff had tried to physically hurt others at work and had tried to hurt her sisters; she also got into verbal fights at her most recent job (Tr. 53). Plaintiff had problems with concentration and could not focus on TV shows, books, magazines, or a newspaper article (Tr. 53-54). Plaintiff testified that her concentration difficulties caused her to make daily mistakes at her last job (Tr. 54). Plaintiff had stopped treatment with Volunteer Behavioral Health due to losing insurance, but was able to seek mental health treatment with Philip A. Johnson, Ph.D. due to TennCare (Tr. 54). Plaintiff testified her psychological problems were more of a problem than her physical conditions (Tr. 55).

Plaintiff lived with her two sisters and her 10-year-old son (Tr. 43). She previously had custody of a friend's daughter from the time of her birth, but her mother had returned and taken the child back (Tr. 49). On a typical day, Plaintiff would get her son ready for school, and then she would clean, watch TV, and maybe take a nap while he was at school and her sisters were working; after he returned home, she would help him with his homework (Tr. 46). Later in the evening, Plaintiff's sisters would prepare dinner and sometimes watch a movie or sit around and talk (Tr. 46, 51). Plaintiff's son went to bed at 9:30 and she went to bed around the same time (Tr. 46). Plaintiff testified that her sisters and a friend helped her take care of her son and did the cooking (Tr. 50). Plaintiff still took care of the housework, but they helped with laundry and reminded her to take her medicine (Tr. 51). Plaintiff did not like to go to the store and only went out of the house for doctor's appointments (Tr. 51). Plaintiff would drive to appointments if she had to, but did not like to drive (Tr. 52). Her sisters did all the grocery shopping (Tr. 51-52).

3

### B.     Vocational Expert Testimony

During the hearing, the ALJ sought the testimony of vocational expert ("VE") Dr. Rodney Caldwell.  The ALJ asked the VE to assume an individual with Plaintiff's past work experience who was restricted to light work, but could not climb ladders, ropes or scaffolds and could only occasionally perform other postural movements, had to avoid extreme cold, hazards, and pulmonary irritants, and was restricted to unskilled work tasks that could be learned in less than 30 days, involving no more than simple work-related decisions with few workplace changes, where the individual would only occasionally interact with the public, coworkers and supervisors (Tr. 58-59). The VE testified that the hypothetical individual could not perform Plaintiff's past work, but could work as an assembler, with 2,000 jobs regionally and 250,000 nationally; production inspector, with 1,200 jobs regionally and 125,000 in the national economy; or a hand packer/packager, with 1,300 jobs regionally and 140,000 in the nation (Tr. 59).

The ALJ next asked if there would be jobs available if an individual was extremely impaired such that they could not maintain attention and concentration for two hour periods and the VE testified no jobs would be available for such an individual (Tr. 59).  The VE further testified there would be no jobs available if the individual was unable to perform activities within a schedule and would miss more than two days a month on a regular basis, and there would likewise be no jobs available if the individual could not work in proximity to others without being distracted by them, meaning that they would be distracted just by being around others even if they were not interacting with them (Tr. 60).

### C.     Medical Records

Plaintiff followed with Dr. Nabil Cyleman from 2003 through 2008, sometimes reported

problems with depression, bipolar disorder, and anxiety to him, and he prescribed and often refilled her mental health medications (Tr. 224-70, 275-90). In April 2008, Plaintiff sought treatment from Volunteer Behavioral Health (Tr. 328-34). During her initial assessment, Plaintiff reported being very depressed and stressed out and getting edgy with her children; she reported receiving psychiatric medication from Dr. Cyleman for the past nine years and had recently received mental health treatment from Dr. Parks, but had stopped treatment three months prior and had stopped taking her medication at that time (Tr. 328). Plaintiff reported taking several psychiatric medications over the years but stated that they all seemed to stop working well after a while (Tr. 328). Plaintiff was easily overwhelmed and frustrated, had mood swings, could get very angry quickly, her depression was eight on a scale of one to 10, and she reported a past suicide attempt, high anxiety with panic attacks, excessive worry, poor concentration and memory, disturbed sleep, and hallucinations and voices (Tr. 328). Plaintiff was diagnosed with bipolar disorder, not otherwise specified, and her Global Assessment of Functioning ("GAF") score was 48[1] (Tr. 331). During a session with Elizabeth Rodgers the same day, Plaintiff's depression was characterized as severe and her anxiety as high, her GAF was 40, and Invega and Buspar were prescribed (Tr. 333-34).

At her next appointment on May 20, 2008, Plaintiff had not improved, the Buspar was causing problems with sleep, she was tearful and angry daily and having a lot of ups and downs, and her depression was still 8/10 (Tr. 326-27). Plaintiff was depressed but agitated and moody, her GAF

---

[1] A GAF score between 31 and 40 indicates "some impairment in reality testing or communication" or a "major impairment in several areas," a GAF score between 41 and 50 corresponds to a "serious" psychological impairment; a score between 51 and 60 corresponds to a "moderate" impairment; and a score between 61 and 70 corresponds to a "mild" impairment. *Nowlen v. Comm'r of Soc. Sec.*, 277 F. Supp. 2d 718, 726 (E.D. Mich. 2003).

5

was 48,[2] and Depakote was prescribed (Tr. 326-27). On June 3, 2008, Plaintiff was still moody and irritated and short with her children, she was tearful and reported the Depakote did not seem to be helping enough and she never got a break; she was referred to the respite program (Tr. 323-24). During her session on June 25, 2008, Plaintiff was not sleeping well, had stopped taking Invega after she ran out because she felt it was not helping, and denied psychosis; Depakote was discontinued and Trileptal was prescribed (Tr. 321-22). On July 16, 2008, Plaintiff reported she was tolerating Trileptal better and her husband had noticed an improvement, she was sleeping better, and felt more rested (Tr. 319-20).

On September 27, 2008, Plaintiff reported the Invega did not help, and she was always hearing voices but they did not bother her because she ignored them, and no medicine had helped this; her mood was stable with Trileptal, but she was having high anxiety and stress due to a health crisis, as her cancer had returned (Tr. 317-18). Ativan was prescribed for anxiety and Invega was discontinued (Tr. 317-18). During her session December 19, 2008, Plaintiff was upset because she was out of medication after the pharmacy lost her prescription and she had been moody and irritated; she had recently had surgery for the cancer (Tr. 315-16). On January 27, 2009, Plaintiff wanted to change the Ativan because it only worked for short periods; she had just started a new job at Liberty Tax and reported fluctuating moods, poor sleep, and was trying to concentrate but her mind wandered (Tr. 313-14). Xanax was prescribed and her Trileptal dosage was increased (Tr. 313-14). On March 11, 2009, Plaintiff reported continued panic and anxiety and could not tolerate the higher

---

[2]  Plaintiff's GAF score remained the same for the entirety of her treatment at Volunteer Behavioral Health. However, as no highest and lowest GAF scores are documented in any of these records and none of her diagnostic information ever changed, it is unclear whether her GAF score was ever assessed again following her intake session.

dosage of Trileptal, but asked for a higher dosage of Xanax (Tr. 311-12). At her next appointment on May 13, 2009, Plaintiff reported the Trileptal was no longer helping and she was tearful daily, not sleeping well, and emotional about her son's health and legal issues; Prozac and Abilify were prescribed (Tr. 309-10). Plaintiff reported depression at 5/10 on June 3, 2009 and had not noticed a difference with Prozac (Tr. 307-08). On July 1, 2009, Plaintiff was taking her medications as prescribed and was feeling better overall, was more playful, less hopeless, calmer, and sleeping well; a significant positive increase was noted in Plaintiff's level of functioning (Tr. 305-06). During her next session on October 1, 2009, Plaintiff reported poor sleep, had recently lost her job after she "flipped at work," and was still hearing voices; Stavzor was prescribed (Tr. 303-04).

Plaintiff again followed with Dr. Cyleman to obtain medication for bipolar disorder from 2009 through 2011 (Tr. 408-33, 442-53). In May 2010, Plaintiff began following with Dr. Johnson for her mental health treatment, but the first session which appears in the record is from August 25, 2010 (Tr. 483, 491). On this date, Plaintiff arrived late because she had been cleaning and Dr. Johnson observed Plaintiff was very thorough and may have trouble stopping things based on her score on one of the tests he had administered (Tr. 491). They discussed her problems with anger and rage and ways to cope (Tr. 491). Plaintiff's sister filled out a function report on September 1, 2010 and indicated that Plaintiff took care of her two children, got them ready for school, fed them and bathed them; sometimes had to be reminded to take her medication; did light cooking, cleaning and laundry on a daily basis and sometimes had help with the cleaning; drove sometimes but had a poor memory; shopped once a week for about three hours; did not handle money; had problems concentrating and was confused by changes; and went out about once a week to the doctor (Tr. 164-71).

Plaintiff filled out a function report on September 15, 2010 and stated she forgot things and her mood swings and outbursts kept her from completing tasks, but on a daily basis she got her children ready for school; performed laundry and cleaning chores around the house with help from her sister and a friend; picked her children up from school; sometimes did light cooking; had no problems with personal care but sometimes needed reminders for personal care and taking her medication; did not drive because of her poor memory; did not do yard work because she would use the lawn mowers and weed eater as weapons; shopped twice a month for about an hour; could handle money; was able to read and watch TV, but had problems concentrating; spent time with others three times a week; and had problems handling stress and changes (Tr. 192-99).

Also on September 15, Plaintiff returned to Dr. Johnson and was angry and depressed due to a recent situation in which the daughter of a friend took advantage of her and betrayed her by stealing money; Plaintiff acknowledged chronic suicidal thoughts and stated a part of her wanted to live and a part of her wanted to die (Tr. 489-90). Plaintiff reported frequent forgetfulness on September 24, 2010 and was also having health issues and problems sleeping (Tr. 487-88). On September 29, 2010, Plaintiff talked about when she started hearing voices and the first time she lost time, her son's health problems, and her mother's death (Tr. 485-86). During her appointment on October 5, 2010, Plaintiff discussed the voices; one was a little girl talking loudly and angrily, one was a deep voiced, bossy man, and one was an assertive woman; they sometimes got loud and distracted her and were noisy when she approached Dr. Johnson's building (Tr. 484). On October 13, 2010, Plaintiff was exhausted after a visit to the emergency room with her son and was upset with her husband for inadequate support; she talked more during the session and they discussed setting boundaries (Tr. 482-83).

8

On November 9, 2010, Plaintiff submitted to a psychological assessment with Dr. Carol Phillips (Tr. 365-69). Dr. Phillips observed that Plaintiff appeared to present her history and symptoms in a dramatic, exaggerated manner (Tr. 365). Plaintiff reported being on Prozac and Xanax as prescribed by Dr. Cyleman (Tr. 365). Plaintiff reported working a few months out of the last several years preparing tax returns and stated she had a history of schizophrenia, social anxiety, panic attacks, suicidal ideation, bipolar and manic depression (Tr. 366). She reported being an isolated individual because she was uncomfortable with more people around, but had issues with anxiety and panic attacks at home as well; she further reported she had been in therapy for a long time and tried a lot of medications, but never got better (Tr. 366). Dr. Phillips observed Plaintiff's mood was depressed and her affect was extremely flat, and Plaintiff reported no history of hallucinations or delusions (Tr. 367).

Plaintiff reported her daily activities included maintaining her household, caring for her children, watching TV and reading; she cleaned while her children were in school and had no issues caring for them, stating she played with them and helped them with homework (Tr. 367). Plaintiff shopped twice a month and had frequent contact with her family, including by phone; she managed her own money, attended doctor's appointments, and drove when needed (Tr. 367). She reported disturbed sleep due to anxiety (Tr. 367).

Dr. Phillips opined Plaintiff was in the average range of intellectual functioning and her diagnostic impressions were mood disorder, not otherwise specified and personality disorder, not otherwise specified (Tr. 367). Dr. Phillips opined Plaintiff had no impairment in understanding or remembering simple or detailed information, and was mildly to moderately impaired in concentration, persistence and pace; social behaviors; and adaptability (Tr. 368).

On November 23, 2010, Dr. Carole Kendall filled out a mental residual functional capacity ("MRFC") assessment and a psychiatric review technique ("PRT"). In the PRT, Dr. Kendall opined Plaintiff had moderate restrictions in her activities of daily living, maintaining social functioning, and maintaining concentration, persistence and pace and had had no episodes of decompensation (Tr. 339-50). Dr. Kendall noted that Plaintiff's limitations appeared to be moderate and Plaintiff's statements about her symptoms were mostly credible, but there were discrepancies between her own reports (Tr. 351). In the MRFC, Dr. Kendall more specifically opined Plaintiff would be markedly limited in her ability to interact appropriately with the general public and would have moderate limitations in her abilities in the following areas: understanding, remembering and carrying out detailed instructions; maintaining attention and concentration for extended periods; working in coordination with or proximity to others without being distracted; completing a normal workday and workweek without interruption from psychological symptoms; accepting instructions and responding appropriately to criticism from supervisors; getting along with coworkers or peers without distracting them; maintaining socially appropriate behavior and adhering to basic standards of neatness and cleanliness; responding appropriately to changes in the work setting; and setting realistic goals or making plans independently of others (Tr. 335-36). Dr. Kendall further opined Plaintiff could understand and remember simple and detailed tasks, but could not make independent decisions at an executive level; could concentrate and persist on tasks for a two hour period in an eight hour day with routine breaks; and could not interact with the general public and would work better with things than with people (Tr. 337).

Plaintiff returned to Dr. Johnson on December 29, 2010 after being hospitalized with pneumonia and was concerned about her breathing problems; she stated she returned because she

10

thought it was helping and reported difficulties with Christmas crowds and gatherings (Tr. 481).

On January 5, 2011, Plaintiff reported recently losing time and ending up in Georgia; her husband told her later that she had talked to him and was hateful and stated he should never call her again (Tr. 480). Plaintiff reported her husband was trying to be more considerate and they were buying a house (Tr. 480). On January 26, 2011, Plaintiff brought in paperwork for her Social Security claim and announced she had decided to seek disability to get Social Security Medicare because TennCare was not stable (Tr. 481). Plaintiff agreed to come in for testing the following week (Tr. 481). Plaintiff was in a bad mood and was angry; she reported voices yelling, and had attempted to work at Rapid Tax for a week, but had a panic attack due to lots of people being around (Tr. 481). Plaintiff reported everyone said she should try to get disability (Tr. 481).

Dr. Johnson performed testing on Plaintiff on February 3, 2011 and noted the MMPI-II was uninterpretable and Plaintiff stated she cried all the time at home, but had not cried there (Tr. 479). On February 16, 2011, Plaintiff was exhausted and ill, felt overwhelmed, could not focus on multiple people at one time, and did not trust people; she reported the voices were waking her up and she was sleep deprived (Tr. 479). Plaintiff canceled her next appointment and returned on March 25, 2011, at which time she reported the voices were telling her to let them take over and cried more than usual about missing her mother (Tr. 478-79). On April 1, 2011, Plaintiff called Social Security during her session to get instructions on faxing and reported she had stopped taking Prozac because it wasn't helping; Plaintiff called Social Security again during her April 6, 2011 session and was anxious about the process because she feared losing her insurance (Tr. 478).

During her session on May 18, 2011, Plaintiff was cancer-free after a hysterectomy but recounted feeling compelled to return to her homemaker role after surgery and had been cooking,

11

cleaning, and doing laundry (Tr. 477). Plaintiff reported the voices were active and distracting and recounted a recent dissociative episode where she told her husband and son she did not know them, drove off in her husband's truck, picked up a six-pack of beer, and did not return until six in the morning with an empty beer can on the floor (Tr. 477). Plaintiff reported the voices were telling her not to recount the story because they expected psychiatric hospitalization (Tr. 477).

On June 20, 2011, Plaintiff talked about her male alter and grief over her mother's death (Tr. 476). During a session on August 4, 2011, Plaintiff stated she wanted to get better, stop crying, and stop having up and down moods and panic attacks; she discussed her health issues (Tr. 475). On October 31, 2011, Plaintiff discussed doing artwork as a child, but had stopped after she got sick with cancer (Tr. 474). In November 2011, Plaintiff attended the session with her two children and recounted having temporary guests causing chaos in the household and her husband was staying away from home a lot; she was feeling better later in the month but reported usually becoming stressed by late morning (Tr. 474).

Dr. Johnson filled out a medical statement on December 14, 2011 and opined Plaintiff had a current GAF of 30, with a range of 20-40 (Tr. 468-70). Dr. Johnson opined Plaintiff exhibited all symptoms of bipolar disorder, had marked limitations in activities of daily living and extreme limitations in maintaining social functioning, would probably have deficiencies in concentration, persistence or pace in work-like settings, although he could not specifically speak to that setting, and had had episodes of decompensation (Tr. 469). Dr. Johnson opined Plaintiff was extremely impaired in the following abilities: carrying out detailed instructions; maintaining attention and concentration for extended periods; performing activities within a schedule, maintaining regular attendance, and being punctual; working in coordination with or proximity to others without being distracted;

completing a normal workday and workweek without interruption from psychological symptoms; accepting instructions and responding appropriately to criticism from supervisors; getting along with coworkers or peers without distracting them; maintaining socially appropriate behavior and adhering to basic standards of neatness and cleanliness; and traveling in unfamiliar places or using public transportation (Tr. 469-70). Plaintiff was markedly impaired in understanding and remembering detailed instructions; carrying out short and simple instructions; and sustaining an ordinary routine without special supervision; and she was not significantly impaired in remembering locations and work-like procedures; understanding and remembering short and simple instructions; making simple work-related decisions; interacting appropriately with the general public; asking simple questions or requesting assistance; responding appropriately to changes in the work setting; being aware of normal hazards and taking appropriate precautions; and setting realistic goals or making plans independently of others (Tr. 469-70). Dr. Johnson noted that Plaintiff was bright and able to do many things, but she could not maintain, sustain, or adapt to changes reliably due to her psychiatric diagnoses; he opined her emotions fluctuated widely and unpredictable and her attention and concentration would be unexpectedly disrupted by inner voices or fugue states, during which she carried on activities she did not even remember (Tr. 470).

Dr. Johnson wrote an Interim Treatment Summary the same day, in which he noted he had had 42 sessions with Plaintiff since May 2010 but acknowledged Plaintiff had missed about one third of her scheduled appointments (Tr. 463-65). Dr. Johnson assessed Plaintiff's diagnoses as post traumatic stress disorder ("PTSD"), chronic severe; dissociative disorder, not otherwise specified; generalized anxiety disorder, with panic attacks; major depressive disorder, recurrent, moderate to severe; and avoidant personality disorder, with depressive and self-defeating personality traits (Tr.

13

463). Plaintiff's PTSD was associated with childhood sexual abuse, physical and emotional abuse by a partner, and her mother's death, and Dr. Johnson noted Plaintiff's attempt to return to work ended due to panic attacks (Tr. 463). Dr. Johnson opined Plaintiff's adaptive functioning was uneven and Plaintiff had significant periods of time in a GAF low point of 20 to 40, due to her dissociative episodes and recurrent suicidal ideation (Tr. 463). Dr. Johnson noted the tests he administered on Plaintiff and noted Plaintiff was only taking Xanax, as no other medication had helped her (Tr. 464). Dr. Johnson noted Plaintiff struggled to explain herself initially and had improved somewhat, but was still passive and waiting to respond despite internal conversation and evident emotional strain; he observed she spoke easily about her son playing baseball and her involvement with the team (Tr. 464). Dr. Johnson noted Plaintiff had difficulty making decisions about herself but could easily make decisions about her children; presented herself to strangers as quite normal; but described several distinct parts of herself that all spoke to her with different voices and had different agendas, taking control of her and undertaking activities for which she later had no memory (Tr. 464-65). Dr. Johnson opined Plaintiff was chronically anxious, uncomfortable with strangers, stressed by auditory hallucinations/voices from alter personalities, exhausted from sleep loss and depression, with chronic, recurrent suicidal ideation (Tr. 465). Dr. Johnson further opined Plaintiff was disabled for employment purposes because she could not sustain employment with her current mental status (Tr. 465).

During her December 15, 2011 appointment with Dr. Johnson, Plaintiff reported recent diagnoses of chronic obstructive pulmonary disease ("COPD") and congestive heart failure, reported more issues with her houseguests, a fight with her husband, and her son's recent surgery (Tr. 473). On December 29, 2011, Plaintiff reported continued issues with her health, including a possible

mistake with her COPD diagnosis and frustration over obtaining the right medication (Tr. 472).

## III. ALJ'S FINDINGS

### A. Eligibility for Disability Benefits

The Social Security Administration determines eligibility for disability benefits by following

a five-step process. 20 C.F.R. § 404.1520(a)(4)(i-v).

> 1) If the claimant is doing substantial gainful activity, the claimant is not disabled.
>
> 2) If the claimant does not have a severe medically determinable physical or mental impairment-i.e., an impairment that significantly limits his or her physical or mental ability to do basic work activities-the claimant is not disabled.
>
> 3) If the claimant has a severe impairment(s) that meets or equals one of the listings in Appendix 1 to Subpart P of the regulations and meets the duration requirement, the claimant is disabled.
>
> 4) If the claimant's impairment does not prevent him or her from doing his or her past relevant work, the claimant is not disabled.
>
> 5) If the claimant can make an adjustment to other work, the claimant is not disabled.

*Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647 (6th Cir. 2009). The claimant bears the burden to

show the extent of his impairments, but at step five, the Commissioner bears the burden to show that,

notwithstanding those impairments, there are jobs the claimant is capable of performing. *See*

*Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).

### B. ALJ's Application of the Sequential Evaluation Process

At step one of this process, the ALJ found Plaintiff had not engaged in any substantial

gainful activity since April 27, 2005, the alleged onset date (Tr. 21). At step two, the ALJ found

Plaintiff had severe impairments of degenerative arthritis of the lumbar spine, chronic obstructive

15

pulmonary disease (COPD), obstructive sleep apnea, post traumatic stress disorder (PTSD), bipolar disorder, generalized anxiety disorder, and obesity (Tr. 21). At step three, the ALJ found Plaintiff did not have any impairment or combination of impairments to meet or medically equal any of the presumptively disabling impairments listed at 20 C.F.R. Pt. 404, Subpt. P, App'x. 1 (Tr. 22). The ALJ noted that he specifically considered Listings 3.02, 12.04, 12.06, and 12.08 (Tr. 22). The ALJ determined Plaintiff had the residual functional capacity ("RFC") to perform light work except she could only perform unskilled work consisting of tasks that could be learned in less than 30 days and would involve no more than simple work-related decisions and few workplace changes; could only have occasional contact with supervisors, coworkers and the general public; could not climb ladders, ropes, or scaffolds; could perform other posturals occasionally; and would need to avoid extreme cold, dangerous hazards, and work environments with pulmonary irritants (Tr. 27). At step four, the ALJ found Plaintiff was unable to perform her past relevant work (Tr. 31). At step five, the ALJ found that Plaintiff was 28, a younger individual, on the alleged onset date and, after considering Plaintiff's age, education, work experience, and RFC, the ALJ found there were jobs that existed in significant numbers in the national economy which Plaintiff could perform (Tr. 31). This finding led to the ALJ's determination that Plaintiff was not under a disability as of April 27, 2005 (Tr. 32).

## IV.    ANALYSIS

Plaintiff asserts one argument with respect to the ALJ's treatment of Dr. Johnson's opinion, arguing that the ALJ did not properly assess this opinion pursuant to the "treating physician rule" and, thus, his decision that Plaintiff is not disabled is not supported by substantial evidence.

### A.    Standard of Review

A court must affirm the Commissioner's decision unless it rests on an incorrect legal

16

standard or is unsupported by substantial evidence. 42 U.S.C. § 405(g); *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004) (quoting *Walters*, 127 F.3d at 528). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Garner v. Heckler*, 745 F.2d 383, 388 (6th Cir. 1984) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). Furthermore, the evidence must be "substantial" in light of the record as a whole, "tak[ing] into account whatever in the record fairly detracts from its weight." *Id.* (internal quotes omitted). If there is substantial evidence to support the Commissioner's findings, they should be affirmed, even if the court might have decided facts differently, or if substantial evidence would also have supported other findings. *Smith v. Chater*, 99 F.3d 780, 782 (6th Cir. 1996); *Ross v. Richardson*, 440 F.2d 690, 691 (6th Cir. 1971). The court may not re-weigh evidence, resolve conflicts in evidence, or decide questions of credibility. *Garner*, 745 F.2d at 387. The substantial evidence standard allows considerable latitude to administrative decisionmakers because it presupposes there is a zone of choice within which the decisionmakers can go either way, without interference by the courts. *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994).

The court may consider any evidence in the record, regardless of whether it has been cited by the ALJ. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The court may not, however, consider any evidence which was not before the ALJ for purposes of substantial evidence review. *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001). Furthermore, the court is under no obligation to scour the record for errors not identified by the claimant, *Howington v. Astrue*, No. 2:08-CV-189, 2009 WL 2579620, at *6 (E.D. Tenn. Aug. 18, 2009) (stating that assignments of error not made by claimant were waived), and arguments not raised and supported in more than a perfunctory manner may be deemed waived, *Woods v. Comm'r of Soc. Sec.*, No. 1:08-CV-651, 2009

17

WL 3153153, at *7 (W.D. Mich. Sep. 29, 2009) (citing *McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997)) (noting that conclusory claim of error without further argument or authority may be considered waived).

### B. Dr. Johnson's Opinion

Plaintiff argues the ALJ's opinion is not supported by substantial evidence because he failed to properly apply the treating physician rule, along with the factors in 20 C.F.R. § 404.1527, to Dr. Johnson's opinion and did not provide good reasons for ignoring the opinion [Doc. 10 at PageID# 35-36]. Plaintiff contends the ALJ based his conclusions on the opinions of two non-treating sources who did not review all of the medical records instead of the opinion of Dr. Johnson, who spent significant time with Plaintiff in psychotherapy [*id.* at PageID# 36]. Plaintiff asserts the ALJ referenced inconsistencies to support his decision, but did not reference any specific information from Dr. Johnson's notes and did not refer to any mental status examinations, GAF scores, or other testing done by Plaintiff's treating sources [*id.*]. Plaintiff argues these inconsistencies about her reported daily activities, when compared with the other evidence the ALJ did not reference, do not constitute substantial evidence for his decision [*id.*]. Plaintiff further argues that Dr. Johnson's opinion is supported by the medical evidence in the record and thus was entitled to controlling weight; however, the ALJ did not give the opinion controlling weight, which was error [*id.* at PageID# 36-37]. Plaintiff acknowledges the ALJ could give the opinion less than controlling weight as long as he provided good reasons supported by evidence, but argues the reasons relied upon by the ALJ are not valid when Plaintiff's testimony and other evidence contradict these findings [*id.* at PageID# 37-38]. Plaintiff also argues the ALJ did not pay adequate attention to the factors in 20 C.F.R. § 404.1527 in addressing Dr. Johnson's opinion [*id.*].

18

The Commissioner asserts the ALJ discounted Dr. Johnson's opinion because it was inconsistent with the evidence in the record and he gave good reasons for rejecting the opinion; specifically, the ALJ noted that Dr. Johnson's extreme limitations were internally inconsistent and inconsistent with Plaintiff's treatment records from Volunteer Behavioral Health, noted Plaintiff's noncompliance with medication several times, and noted the limitations imposed by Dr. Johnson were inconsistent with Plaintiff's reported daily activities, such as caring for children, cleaning, working temporarily preparing taxes, and traveling with her son's baseball team [Doc. 12 at PageID# 48-49]. The Commissioner contends the ALJ properly evaluated all the opinions in the record and provided sufficient reasons for the weight given to these opinions [*id.* at PageID# 49].

The law governing the weight to be given to a treating physician's opinion, often referred to as the treating physician rule, is settled: A treating physician's opinion is entitled to complete deference if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and "not inconsistent with the other substantial evidence in [the] case record." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) (quoting 20 C.F.R. § 404.1527(d)(2)) (alteration in original). Even if the ALJ determines that the treating source's opinion is not entitled to controlling weight, the opinion is still entitled to substantial deference or weight commensurate with "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source." 20 C.F.R. § 404.1527(d)(2); SSR 96-2p; *Simpson v. Comm'r of Soc. Sec.*, 344 F. App'x 181, 192 (6th Cir. 2009). The ALJ is not required to explain how he considered each of these factors, but must nonetheless give "good reasons" for rejecting or discounting a treating physician's opinion. *Francis v. Comm'r of Soc. Sec.*,

414 F. App'x 802, 804 (6th Cir. 2011). These reasons must be "supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 545 (6th Cir. 2004) (quoting SSR 96-2p).

The United States Court of Appeals for the Sixth Circuit has reiterated that remand may be required when the ALJ fails to specify the weight afforded to a treating physician's opinion and fails to provide good reasons for giving the opinion an unspecified weight that is less than controlling. *Cole v. Astrue*, 661 F.3d 931, 938-39 (6th Cir. 2011). As stated in *Cole*, "[t]his Court has made clear that '[w]e do not hesitate to remand when the Commissioner has not provided "good reasons" for the weight given to a treating physician's opinion and we will continue remanding when we encounter opinions from ALJ's that do not comprehensively set forth the reasons for the weight assigned." *Id.* at 939 (quoting *Hensley v. Astrue*, 573 F.3d 263, 267 (6th Cir. 2009)). In the same vein, the Sixth Circuit also recently took issue with a stated good reason that the treating physician opinion "conflicted with other evidence," noting the allegedly conflicting evidence must be specified and "must consist of more than the medical opinions of the nontreating and nonexamining doctors. Otherwise the treating-physician rule would have no practical force because the treating source's opinion would have controlling weight only when the other sources agreed with that opinion." *Gayheart v. Comm'r of Soc. Sec*, ___ F.3d ___, 2013 WL 896255 (6th Cir. Mar. 12, 2013). The Sixth Circuit further held that "[a] more rigorous scrutiny of the treating-source opinion than the nontreating and nonexamining opinions is precisely the inverse of the analysis that the regulation requires." *Id.* at *13. Although "a properly balanced analysis might allow the Commissioner to ultimately defer more to the opinions of consultative doctors than to those of treating physicians .

20

. . the regulations do not allow the application of greater scrutiny to a treating-source opinion as a means to justify giving such an opinion little weight." *Id.* (citations omitted).

Failure to give good reasons requires remand, even if the ALJ's decision is otherwise supported by substantial evidence, unless the error is de minimis. *Wilson*, 378 F.3d at 544, 547. In *Cole*, the Sixth Circuit recognized that a violation of the "good reasons" rule could only be harmless error under three circumstances: where the treating source opinion was patently deficient such that it could not be credited; where the Commissioner adopted the opinion of the treating source or made findings consistent with that opinion; or where the Commissioner otherwise met the goal of the treating source regulation, 20 C.F.R. § 404.1527(d)(2). *Cole*, 661 F.3d at 940 (quoting *Friend v. Comm'r of Soc. Sec.*, 375 F. App'x 543, 551 (6th Cir. 2010)). While each case must be evaluated to determine if the required procedures have been appropriately followed, an ALJ's failure to specify the weight afforded to a treating physician or to outline sufficiently specific good reasons could be grounds for remand. *Gayheart*, 2013 WL 896255 at *13; *Cole*, 661 F.3d at 939-40.

The ALJ devoted a significant portion of his opinion to addressing Plaintiff's mental health conditions. The ALJ discussed all of Plaintiff's mental health records at length and concluded that Plaintiff had moderate difficulties in activities of daily living, concentration, persistence and pace, and social functioning and had had no episodes of decompensation (Tr. 22-23).

The ALJ stated as follows with respect to Dr. Johnson's opinion:

> In a mental medical source opinion consisting of a standard, prepared fill-in-the-blank/check-box form, dated December 14, 2011, Dr. Johnson indicated that he had been seeing the claimant since May 28, 2010. Dr. Johnson further circled yes to all disease symptoms and indicated that the claimant's GAF scores ranged from 20 to 40. As to general limitations, Dr. Johnson circled "marked" restrictions in activities of daily living and circled "extreme" difficulty in maintaining social functioning. I find this grossly inconsistent with

21

the medical evidence of record, which indicated that the claimant had never received impatient [sic] treatment for her mental impairments. Furthermore, progress notes from Volunteer Behavioral Health Care indicated general improvement when compliant with medication. Additionally, Dr. Johnson's opinion is inconsistent with the claimant's own descriptions of her activities of daily living and social functioning as indicated in adult function reports and as self described to independent psychological consultant Carol Phillips, Ed.D. As to deficiencies in concentration, persistence, or pace, Dr. Johnson wrote in that the claimant "probably" had deficiencies "in work like settings, though he could not speak to that." With regard to work limitations, Dr. Johnson indicated marked and extreme impairments in various functional activities such as: the ability to understand, remember, and carryout [sic] simple and detailed instructions; maintain attention and concentration, persistence, or pace for extended periods; the inability to work in coordination with others without being distracted by them; the ability to accept instructions and respond appropriately to criticism from supervisors; the ability to get along with coworkers or peers without distracting them; and the ability to maintain socially appropriate behavior. Dr. Johnson contradicted himself by selecting no significant impairment in the following work related functions: the ability to remember locations and work-like procedures; the ability to understand and remember short and simple instructions and make simple work related decisions; the ability to interact appropriately with the general public; the ability to ask simple questions or request assistance; the ability to respond appropriately to changes in the work setting; and the ability to set realistic goals or make plans independently of others. Dr. Johnson commented that the claimant was "bright and able to do many things." Dr. Johnson contradicted himself again when he stated that the claimant could not "maintain, sustain, and adapt to changes," after he previously selected no significant impairment in the claimant's "ability to respond appropriately to changes in the work setting."

The claimant's representative has also placed reliance on the claimant's reported GAF scores as supportive of a finding of disability. However, I find the claimant's GAF scores inconsistent with the medical evidence of record as a whole. I specifically note the inconsistent GAF scores in progress notes from Volunteer Behavioral Health Care that remained at 48 despite indications of general improvement over time with mediation. As to Dr. Johnson's stated GAF scores ranging from 20 to 40, I find them inconsistent with his own indication of non-significant limitations in various work

22

related functions as described above, and inconsistent with the findings from examining independent psychological consultant Carol Phillips, Ed.D, and with the claimant's own descriptions of daily activities.
. . .
Less weight was given to the opinion of treating psychologist Philip A. Johnson, Ph.D. Although I did consider Dr. Johnson's treatment notes, including his diagnoses, I have given little weight to his opinion that the claimant's mental impairments cause marked and extreme limitations due to gross inconsistencies with the medical evidence of record, the claimant's own description of activities of daily living, and with Dr. Johnson's contradictory indications as discussed . . . above. As to Dr. Johnson's opinion that the claimant is disabled, I also give this little weight because it is beyond the scope of a proper medical opinion. Dr. Johnson has admitted that he is a psychotherapist, not a disability examiner. Furthermore, opinions on employability are more properly the province of a vocational expert, and while a medical professional's conclusions may be sound, in our system of review they are entitled to no more weight than would be given to a vocational expert's medical diagnosis. Likewise, the question of a claimant's disability is a question reserved for the Commissioner, and medical opinions on such matters are merely some of the evidence to be considered before that determination is made.

(Tr. 25-26, 30). The ALJ noted he was relying heavily on the opinions of Dr. Kendall and Dr. Phillips, both psychologists, and further noted Dr. Kendall had all records available for review and Dr. Phillips performed a mental status examination with clinical observations (Tr. 30). He also noted he was giving Plaintiff the benefit of the doubt in giving greater weight to the opinion of Dr. Kendall, who opined Plaintiff had moderate impairments in mental functioning (Tr. 30).

I **FIND** the ALJ properly complied with the treating physician rule and I **CONCLUDE** his decision to give Dr. Johnson's opinion less than controlling weight was supported by substantial evidence. Contrary to Plaintiff's argument, the ALJ gave several good reasons for giving less than controlling weight to this opinion. Specifically, the ALJ pointed out that the extreme GAF scores opined by Dr. Johnson were inconsistent with Plaintiff's prior mental health treatment, which for

23

years consisted of psychiatric medications prescribed by a primary care physician, indicated improvement with medication while following at Volunteer Behavioral Health, and had never involved hospitalization; that Dr. Johnson's marked and extreme limitations in various areas were inconsistent with Plaintiff's reports of her own daily activities and social functioning;[3] and that Dr. Johnson's opinion was internally inconsistent, as the categories of marked and extreme limitations did not make sense when compared to the categories in which Dr. Johnson opined Plaintiff had no significant impairment. The ALJ further noted statements by Dr. Johnson that Plaintiff was bright and able to do many things, and had spoken with enjoyment about being a team parent for her son's baseball team and traveling with the team, both which cast doubt on the extreme limitations he opined (Tr. 25-26). Moreover, the ALJ noted Dr. Johnson's statement that Plaintiff had missed a third of her appointments (Tr. 25).

Although Plaintiff claims the ALJ unreasonably relied on inconsistencies with respect to her reports of daily activities and did not review any of the mental health evidence in the record, the ALJ stated he had considered Dr. Johnson's treatment notes and his diagnoses and it is clear he reviewed the notes from Volunteer Behavioral Health as well; furthermore, it is true that Plaintiff made somewhat inconsistent statements about her daily and social activities throughout the record, which contributed to the ALJ's finding as to Plaintiff's credibility (Tr. 29). Plaintiff contends, in part, that Dr. Johnson's opinion was consistent with her testimony at the hearing [Doc. 10 at PageID# 38].

---

[3] The ALJ elaborated on this point later in his decision, noting Plaintiff was able to care for children, prepare meals, clean and do laundry by her own report, further noting inconsistent statements as to Plaintiff's ability to drive (in one report she stated she did not drive due to memory, but reported driving sometimes in her psychological examination, and her sister wrote that she sometimes drove) and noting her alleged social isolation, although Plaintiff served as a team parent for her son's baseball team (Tr. 39). Plaintiff also indicated on her function report that she socialized with others three times a week (Tr. 196).

While this may be true, the ALJ made a determination that Plaintiff's subjective complaints were not fully credible and, thus, the ALJ likely would not have relied on this testimony in support of Dr. Johnson's opinion (Tr. 29-30). Moreover, it is worth noting that although Dr. Johnson indicated Plaintiff's functioning was uneven and she spent "significant" amounts of time in the low point of GAF scores (20-40) due to dissociative episodes and "fugue" states, he made no opinion as to Plaintiff's functioning during any other times, and it appears Plaintiff described possibly three such dissociative episodes to Dr. Johnson during one and a half years of therapy (Tr. 463).

Plaintiff is correct in stating that Dr. Johnson performed various mental status tests on Plaintiff; the results of these tests, however, do not appear in the record besides a few notations in his treatment notes, including a notation that one of the tests was uninterpretable (Tr. 479). In addition, although Plaintiff argues the ALJ did not adequately consider the factors in 20 C.F.R. § 404.1527, as noted above, the ALJ is not required to explain how he considered the factors; the rule requires the ALJ must give "good reasons" supported by the evidence in the record, which must be "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Wilson*, 378 F.3d at 545 (quoting SSR 96-2p); *see also Francis*, 414 F. App'x at 804. Here, the decision indicates the ALJ carefully reviewed all of the evidence in the record, including the opinions of state agency psychologist Dr. Kendall, psychological examiner Dr. Phillips, and Plaintiff's treating psychologist, Dr. Johnson, along with Plaintiff's prior mental health records from Volunteer Behavioral Health.

The ALJ's decision discusses Plaintiff's mental health records and opinions at great length and, given his lengthy and detailed analysis of the evidence, it is clear the ALJ did not ignore or neglect to address any pertinent information in the record. After reviewing the record, I **FIND** the ALJ gave sufficient good reasons for giving Dr. Johnson's opinion less than controlling weight. The

ALJ indicated he gave less weight to Dr. Johnson's opinion than to the opinions of Dr. Kendall and Dr. Phillips and provided specific reasons for his decision, all of which are reflected and well supported in the record.  As such, I **FIND** the ALJ complied with the treating physician rule and **CONCLUDE** his reasons for giving little weight to Dr. Johnson's opinion of marked and extreme limitations were supported by substantial evidence.  Accordingly, I **CONCLUDE** the decision of the ALJ was supported by substantial evidence.

V.      **CONCLUSION**

Having carefully reviewed the administrative record and the parties' arguments, I **RECOMMEND** that:[4]

(1)      Plaintiff's motion for summary judgment [Doc. 9] be **DENIED**.

(2)      The Commissioner's motion for summary judgment [Doc. 11] be **GRANTED**.

(3)      The Commissioner's decision denying benefits be **AFFIRMED**.

s/ *Susan K. Lee*
SUSAN K. LEE
UNITED STATES MAGISTRATE JUDGE

---

[4] Any objections to this report and recommendation must be served and filed within fourteen (14) days after service of a copy of this recommended disposition on the objecting party.  Such objections must conform to the requirements of Rule 72(b) of the Federal Rules of Civil Procedure.  Failure to file objections within the time specified waives the right to appeal the district court's order.  *Thomas v. Arn*, 474 U.S. 140, 149 n.7 (1985).  The district court need not provide *de novo* review where objections to this report and recommendation are frivolous, conclusive and general.  *Mira v. Marshall*, 806 F.2d 636, 637 (6th Cir. 1986).  Only specific objections are reserved for appellate review.  *Smith v. Detroit Fed'n of Teachers*, 829 F.2d 1370, 1373 (6th Cir. 1987).